IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES ELMOND DUVAL,

    Petitioner,        No. 2:08-cv-1591 JFM

    vs.

M.C. KRAMER, Warden,

    Respondent.      ORDER[1]

/

        Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2007 denial of parole. He alleges that the action by the Board of Parole Hearings ("Board") and the district attorney's opposition to petitioner's parole, violated the terms of his plea agreement and his right to due process. Petitioner also contends that the state courts' denials were contrary to clearly established law and resulted in a denial of petitioner's due process rights.

BACKGROUND

        Petitioner filed a petition for writ of habeas corpus in the Sutter County Superior Court on February 14, 2008. (Answer, Ex. A.) The Sutter County Superior Court summarily denied the petition on February 19, 2008. (Answer, Ex. B.)

---

[1] Both parties consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). (Docket No. 6; Docket No. 10.)

On March 18, 2008, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Third Appellate District. (Answer, Ex. C.) That petition was denied without comment on March 20, 2008. (Answer, Ex. D.)

Petitioner filed a habeas petition in the California Supreme Court on April 22, 2008, Case No. S162862. (Answer, Ex. E.) The California Supreme Court denied the petition *en banc* on June 18, 2008.

The instant petition was filed on July 10, 2008. (Docket No. 2.)

On January 17, 1995, petitioner was sentenced to a total term of thirty-five years-to-life following his guilty plea to second degree murder and his admission that he used a firearm during the commission of the crime. (Petition, Ex. B-C.) Neither party has provided a copy of any written plea agreement or of the transcript of the guilty plea.[2] Petitioner has provided a copy of the minute order from the October 3, 1994 pretrial conference/entry of plea. (Petition, Ex. B.) This minute order suggests that, in exchange for petitioner's plea, the prosecutor reduced the charge of first degree murder with premeditation and deliberation to a charge of second degree murder. (Petition, Ex. B.) The minute order reflects that petitioner was advised he would be

> sentenced to 15 years to life on the second degree murder and 20 years to life in prison on the use of the firearm enhancement.
>
> [Petitioner] will be eligible for parole and parole date would be 13-1/2 years.
>
> [Petitioner] could be placed on parole for life.

(Id.)

At the 2007 Board hearing, the panel summarized the facts of the crime:

> On January the 6th, 1993, Yuba City Police Department Detective John Arnold was advised by Sergeant Perry of a dead body located

---

[2] Petitioner has provided a copy of a memo from the Sutter County Superior Court stating that the court received petitioner's request for transcripts for November 7, 1994 and November 14, 1994, but "[u]nfortunately, there are no transcripts available for those dates." (Answer, Ex. D.) Petitioner suggests that the transcripts may have been sealed. However, the minute order containing the entry of plea reflected a hearing date of October 3, 1994. (Petition, Ex. B.)

2

at 2172 Live Oak Boulevard and further advised that it appears as though the death was a homicide. Detective Arnold preceded to 2172 Live Oak Boulevard and upon arrival noted the crime scene to be located at the north end of the city in a commercial area. Actual location of the body was at 2168-1/2 Live Oak Boulevard, which is reportedly a commercial garage being used for a janitorial service company, which is attached to 2168 Live Oak Boulevard. The body was located in a small, approximately nine foot by seven foot upstairs loft that had been converted into a living quarters. Detective Arnold contacted Officer Thornton who was the first officer on the scene. Officer Thornton showed Detective Arnold the body in a white – of a white male adult who was lying on his back on a twin size bed who was identified as Terry Dale Boyd. . . . Detective Arnold noted what appears to be a bullet wound to Boyd's right lower abdomen and what appeared to be severe trauma to Boyd's head. There were two small caliber expended shells visible and one being on the floor in between Boyd's feet and one on the left side of Boyd's head. Detective Arnold also located a small bullet wound in Boyd's left leg. A closer examination of the deceased Boyd revealed that blood on his face was still oozing and rigor mortis had not yet set in to his extremities and that he had very little lividity. Also noted that there was quite a bit of blood splattered to the north wall of the loft area and into the blankets of the bed. It was further noted that the interior of the garage loft area showed no signs of forced entry or any kind of struggle. According to the reporting party, Henry Clark, he had to use his key in order to make entry this morning prior to finding the body. He joined the . . . processing of the crime scene. Seven expended 25-caliber rounds were located throughout the loft area. One expended .25-caliber . . . bullet was also located behind Boyd's head on the carpet. On January 7th of 1993, Detective Arnold and Officer Webster went to Ullreys . . . Memorial Chapel in Yuba City in order to witness the autopsy of Terry Dale Boyd. During the course of the autopsy, it was determined that Boyd had been shot seven times with a .25 caliber handgun at close range and that six expended bullets were removed from his body. It was also determined that there were two bullet wounds in Boyd's upper left hand chest cavity that appeared to have been extremely close range if not in fact contact wounds. The aforementioned wounds were also at such an angle that it appeared as though Boyd was bent forward after being shot first in the left leg, then the stomach, two in the chest and then three in the head and face area.

Subsequently, on November the 24th, 1993, during the course of the continued investigation in this matter, Detective Arnold received a collect telephone call from the subject who stated that he had information on Terry Boyd's homicide. Detective Arnold asked the subject how he came about this information, to which he stated that he was there when it happened. . . . The subject identified himself as John Bechtel and stated that the one who shot

1  Terry Boyd was [petitioner].  Detective Arnold reportedly knew the
   name Duval from the beginning of this investigation from an
2  unknown caller that said that a guy named Lurch was responsible, .
   . . . Detective Arnold conducted a check of the name Lurch and
3  found that there were two different subjects that go by that name.
   One was [petitioner].  Detective Arnold asked Bechtel some
4  particulars about the murder, which only law enforcement and
   somebody who was at the crime scene would know.  These
5  questions were what caliber weapon was used, how many times
   was the victim shot and where was the body when the victim was
6  shot.  To these questions Bechtel stated that it was a .25 caliber
   weapon used, that Boyd was shot six or seven times in the chest
7  and head area.  Detective Boyd asked Bechtel why he wished to
   give up this information, to which he stated he wanted to clear his
8  conscious and get his life back together.  Detective Arnold made
   arrangements to meet with Bechtel and Bechtel reportedly asked
9  Arnold that he'd meet with him where he was because [petitioner]
   was looking for him and he was afraid for his own personal safety.
10 Detective Arnold subsequently met with Bechtel a short time later
   in his motel room at which time Bechtel proceeded to give
11 Detective Arnold information concerning the murder of Terry Dale
   Boyd.  Bechtel stated that he had just met [petitioner] prior to the
12 time of the murder.  On the night in question, he wanted to get a
   new passenger side window for his blue Datsun.  Bechtel stated on
13 the evening, morning [sic] hours of the murder, he Bechtel was
   with [petitioner] and [petitioner's] girlfriend Bobby Jeanette
14 Trammels over at an apartment of Bobby's grandmother on a street
   in the north end of Yuba City.  While sitting at a table with the two
15 of them, Bechtel stated he noticed that [petitioner] was playing
   with a small .25 caliber handgun.  Bechtel stated that at
16 approximately 4:00 a.m., [petitioner] told him, that being Bechtel,
   that he knew where he, Bechtel, could get a new window for his
17 vehicle.  [Petitioner] and Bechtel left . . . in Bechtel's blue Datsun
   and drove it to a shop located on Live Oak Boulevard in order to
18 get . . . a new window.  Bechtel pulled up in front of the shop,
   remained in the car while [petitioner] went up to the door.
19 [Petitioner] reportedly knocked and started talking to somebody
   over the side of the building.  There was a small window that
20 possibly some other person was inside looking out.  A few minutes
   later a male adult, Bechtel stated it was Boyd, came to the front
21 door and let Bechtel [sic] in.  [Petitioner] reportedly turned and
   waved at Bechtel, who also came in.  Bechtel reportedly entered
22 the shop where he'd already climbed up a ladder and was in the loft
   like area, [petitioner] following.  Bechtel stated that a few minutes
23 later [petitioner] could be heard arguing with Boyd about Boyd's
   ripping him off for an eight ball of meth.  Bechtel reports hearing
24 Boyd say no, no and then heard pop, pop, pop.  Bechtel reported
   looking up and seeing [petitioner] fumbling with a handgun, it was
25 jammed.  He . . . saw Boyd sort of sitting on the bed or something,
   then he heard pop, pop, pop again.  At this point, Bechtel figured
26 out what happened and that [petitioner] . . . had shot Boyd.

> Bechtel stated he fled to the door and [petitioner] right behind him
> and drove [petitioner] back over to Melton Drive where his
> girlfriend lives.

(Petition, Ex. A at 13-19 (from probation report).)  Petitioner declined to discuss any aspects of the crime.  (Id. at 20.)

A representative of the Sutter County District Attorney's Office was present at the parole hearing to oppose parole and recommended parole be denied for the next five years. (Petition, Ex. A at 51.)  With respect to petitioner's argument that his plea agreement was he would serve 13 - 1/2 years and have a life parole, the district attorney

> referred to . . . the comment by the appellate court concluding that
> the prisoner knew exactly what the consequences of his plea were
> when he entered it.  It was in the context of the withdraw (sic) plea
> but it belies any agreement he thought he had a firm 13 and a half
> years to serve because that was not the agreement, that was not the
> consequences of the plea and the appellate decision concludes
> clearly that he understood the consequences of the plea.

(Petition, Ex. A at 57-58).   Petitioner, represented by counsel, did not object to or take issue with the Deputy District Attorney's statement.  (Id. at 58.)

The panel denied parole, finding that petitioner would pose an unreasonable risk of danger if released:

> the offense . . . was especially cruel, certainly violent and callous.
> In that you shot and murdered a victim after an altercation over the
> minor drug deal gone bad.  The victim was abused during the
> offense, shot and then shot again.  The offense was carried out in a
> manner, which demonstrates certainly an exceptional disregard for
> human suffering and then human life.  The motive for the crime
> was real trivial in relation to the offense in that the crime was over
> a relatively small amount of money.  These conclusions are drawn
> from the statement of facts [recitation of facts omitted].  The
> prisoner had an escalating pattern of criminal conduct.  In this
> regard he had started as a juvenile in the year 1981, where he was
> arrested for petty theft and then was arrested for a . . . Penal Code
> 496 in 1984 in which he got a suspended prison sentence and he
> was arrested for burglary in 1984, which he got three years
> probation and jail time.  He was arrested in 1985 for conspiracy for
> burglary in which he got one year state prison but was sentenced to
> CYA.  He was arrested again in 1987 for being under the influence
> of drugs and having drug paraphernalia.  He was given 90 days jail
> and then in 1993 he was arrested for the instant offense.  He failed

to profit from [society's] previous attempts to correct his criminality. In this regard, juvenile probation, adult probation, CYA, county jail on three different occasions and also then having probation revoked. He had an unstable social history. It was not his fault of course that he came from a divorced family. A family that's constantly on the move every eight to twelve months. He went to 11 different grade schools. He dropped out of school during the eighth grade, however he did pick up a GED later on. He started drinking beer and alcohol at the age of 15. Started using marijuana around the age of 19. Started also using meth about the same period of time and started using it every day. He then was first arrested and convicted in 1981 and that series of arrests and convictions continued on until the instant offense in 1993. The prisoner has recently started programming while incarcerated. He has failed at this point to develop a documented certified marketable skill that can be put to use upon release. He has failed to develop or to upgrade himself educationally or vocationally since he's been in prison. He has only recently started to participate in beneficial self-help programs, which he should certainly continue. He had eight 128 counseling chronos, the last being in the year 2000. He had six serious 115 disciplinary reports, the last one being 6/11 of the year 2002 and that's for disobeying a direct order. Should be noted that in regard to the 115's, he's had of the six, two were for violence and one was for the manufacture of alcohol. The last psychiatric report was 8/17 of 2006, J. Steward, Doctor of Psychology. This was an unfavorable report. He notes the following[:] if released to the community [petitioner] is estimated to have a very high risk for violence, which is based upon his criminal history, the instant offense and the two CDC 115's for violence. In particular, it's very unlikely that one with an antisocial personality disorder [with such propensity] and willingness to kill somebody else to be considered suitable for parole within society. Even though he presents a sociable and affable manner during the interview, this belies a cold, calculated nature of his personality to eliminate somebody else's life without reason or conscience. Terry Boyd who was defenseless and compliant, owed [petitioner] a [paltry] sum and wanted to have . . . his own girlfriend murdered. His parole plans, he does have viable residential plans with his mother. However, he does not have acceptable parole plans. He needs to have more detail in his parole plans working possibly for his mother or family. Either that or he needs to have more detailed parole plans in regard to getting an acceptable position elsewhere, such as working with . . . equipment – probably a lathe or equipment work. He does not have a certified or verified marketable skill at this time. He also needs to develop a substance abuse relapse plan, that is a plan, which lists all the AA and NA facilities in or around the area which [petitioner plans] . . . to . . . parole to. The 3042 responses, we did not receive any letters. However, we did . . . have a representative from the Sutter

/////

County District Attorney's Office who spoke and was against parole at this time and recommended a five year denial.

(Id. at 59-63.) The panel relied on the same factors to find that it was not reasonable to expect that parole would be granted in the following four years. Id. at 64-66.

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

(2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

II. Claims One and Two

Petitioner's first two claims challenge the denial of parole and the district attorney's opposition to parole as a breach of petitioner's plea agreement in violation of petitioner's due process rights. Because no state court rendered a reasoned opinion, this court reviews the record to determine whether the state court decision was objectively unreasonable.

When a criminal defendant pleads guilty in exchange for certain promised actions, his right to due process of law entitles him to fulfillment of those promises. Santobello v. New York, 404 U.S. 257, 262 (1971). In this case, petitioner alleges that his plea of guilty to second degree murder was premised upon a promise that he would parole in 13-1/2 years.

Petitioner has presented nothing showing that the nature of his guilty plea or that any bargain leading to the plea included a promise that he would be paroled or would be paroled on a date certain. The sentencing transcript shows only that the prosecutor moved to edit the charge in count one from first degree murder with premeditation and deliberation to a charge of second degree murder. (Petition, Ex. B.) While it is true that the minute order reflects that the district attorney stated petitioner would be "eligible for parole and parole date would be 13-1/2 years" (id.), such language does not reflect a promise that petitioner would be paroled at any time

short of the maximum term of life.  The prosecutor's statement gave petitioner a possibility, not a guarantee, of parole.  Compare Brown v. Poole, 337 F.3d 1155, 1160 (9th Cir. 2003) (during plea colloquy, prosecutor said that defendant had a right to release after serving half her term if she was disciplinary-free).  Unlike Brown, the prosecutor in the instant case stated petitioner was "eligible"[3] for parole.  In Brown, the prosecutor promised the defendant during the plea colloquy that the defendant would "get out in half the time" if he behaved himself in prison.  Id. at 1158.  The minute order in the instant case does not reflect such a promise and petitioner has presented no other evidence suggesting such an agreement.

Petitioner also argues that the district attorney's opposition to petitioner's parole at the 2007 Board hearing violated petitioner's due process rights.  However, petitioner has not provided any evidence that there was an agreement by the prosecution to refrain from opposing parole.  The minute order does not reflect any such agreement.  (Petition, Ex. B.)  As noted above, petitioner has failed to provide a transcript of the plea hearing.  Compare United States v. Anderson, 970 F.2d 602, 608 (9th Cir. 1992), as amended on denial of rehearing, 990 F.2d 1163 (9th Cir. 1993) (factual stipulations as part of plea agreement may prevent government from presenting additional facts to the parole board); see also People v. McElwee, 128 Cal.App.4th 1348, 1353 (2005) (Harvey did not constrain prosecutor from arguing facts of the offense to the parole board).  Petitioner has failed to bear his burden of showing he is entitled to the issuance of the writ.  Silva v. Woodford, 279 F.3d 825, 835 (9th Cir. 2002) (petitioner's burden to show he is in custody in violation of the constitution).

/////

/////

/////

---

[3] The word "eligible" is defined as "qualified or entitled to be chosen."  The American Heritage® Dictionary of the English Language, Fourth Edition. Retrieved September 18, 2008, from Dictionary.com website:  <http://dictionary.reference.com/browse/eligible>.

III. Third Claim

In his third ground for relief, petitioner contends that the state courts' decisions to deny his petition for habeas corpus and petition for review were contrary to clearly established law and resulted in a denial of petitioner's right to due process.

The Sutter County Superior Court utilized a checklist form of order to deny the petition for writ of habeas corpus. The following boxes were marked:

> Undue delay. Petitioner is required to explain and justify any significant delay in seeking habeas corpus relief (In re Clark, 5 Cal. 4th 750, 764).
>
> Failure to raise issue on appeal. In absence of special circumstances constituting an excuse for failure to employ that remedy, a writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction (In re Walker, 10 Cal.3rd 764, 773 and In re Clark, 5 Cal. 4th 750, 765).
>
> Issues resolved on appeal cannot be reconsidered on habeas corpus. (See In re Waltreus (1965) 62 Cal.2d 218, 225.)

(Petition, Ex. F.) As noted above, both reviewing courts denied petitioner's applications without comment.

In the petition presented to the Sutter County Superior Court, petitioner was also challenging the denial of parole as a breach of his plea agreement. Because petitioner could not have foreseen a future denial of parole, particularly at the time of his direct appeal, petitioner could not have brought this claim at that time. While it appears the Sutter County Superior Court may have misread the petition as a challenge to his plea agreement, his petition made clear he was challenging the Board's denial of parole as a violation of the terms of his plea agreement. (Answer, Ex. A, at 3.) As petitioner notes, the factual predicate of petitioner's claim did not arise until March 21, 2004. (Petition at 7.) Inasmuch as the state court petition challenged the 2007 denial of parole, there was no significant delay in bringing that challenge.

Finally, inasmuch as the issue petitioner raised was not resolved on direct appeal, the citation to In re Waltreus was incorrect as well.

1    The Sutter County Superior Court's summary disposition was incorrect,
2 constituting error under the "contrary to" prong of § 2254(d)(1).  See Frantz v. Hazey, 533 F.3d
3 724 (9th Cir. 2008)(en banc).  Because the Sutter County Superior Court's summary disposition
4 relied on inapplicable legal authorities, it appears the § 2254(d)(1) standard for the grant of
5 habeas relief is satisfied.  Frantz, 533 F.3d at 734.
6    The errors of the state courts do not, however, require that the petition be granted
7 in this court.  Confronted with an analogous situation the Frantz court concluded that "federal
8 habeas courts must review the substantive constitutionality of the state custody de novo."  Id. at
9 737.  In other words, even though § 2254(d)(1) error occurred, this court must now consider de
10 novo whether the denial of parole violated the terms of petitioner's plea agreement.
11    Plea agreements must be analyzed using ordinary rules of contract interpretation.
12 "Plea agreements are contractual in nature and are measured by contract law standards."  United
13 States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir.1993).  The terms of oral plea agreements are
14 enforceable, as are those of any other contracts, even though oral plea agreements are not
15 encouraged by reviewing courts.  See, e.g., United States v. Monreal, 301 F.3d 1127, 1133 (9th
16 Cir. 2002).
17    On this record, the denial of parole did not violate the terms of petitioner's plea
18 agreement.  The October 3, 1994 minute order does not state that petitioner pled guilty to second
19 degree murder in exchange for, *inter alia*, a promise that he would be paroled in thirteen and one-
20 half years.  (Petition, Ex. B.)  Rather, the minute order reflects that the prosecution agreed to
21 reduce the charge in Count I from first degree murder with premeditation and deliberation to
22 second degree murder.  (Id.)  The district attorney advised petitioner of the following pertinent
23 consequences of his plea:

> [Petitioner] is ineligible for probation.
>
> The sentence pursuant to law is 15 years to life on the 2nd degree
> murder and 20 years to life in prison on the use of the firearm
> enhancement.

> [Petitioner] will be eligible for parole and parole date would be 13-1/2 years.
>
> [Petitioner] could be placed on parole for life.
>
> . . .

(Petition, Ex. B.) The minute order does not reflect a promise or guarantee that petitioner would be paroled within thirteen and a half years; only that petitioner would be "eligible" for parole within thirteen and a half years. There is no promise or guarantee that the prosecution would support petitioner's bid for parole at that time or that the prosecution would refrain from opposing petitioner's parole at that time. Because the language "will be eligible for parole" precedes the language "parole date would be 13-1/2 years," parole is conditional on the Board's finding petitioner to be suitable for parole, and the earliest date that determination could be made would be in 13-1/2 years. The sentence "could be placed on parole for life," bolsters the reader's understanding that petitioner's parole status would be determined at a later time.

Petitioner's claim that the prosecutor's statements demonstrate he was promised release on parole in 13-1/2 years does not entitle him to habeas relief. Petitioner has provided no evidence to support an inference that his plea agreement carried a guarantee of release after 13-1/2 years. To the contrary, the record suggests petitioner received an indeterminate sentence of 35 years to life in exchange for his plea of guilty to second degree murder. The record does not reflect that petitioner received an affirmative, or even an ambiguous, assurance that he would be released at a certain point in time. See Buckley v. Terhune, 441 F.3d 688, 691-98 (9th Cir.2006) (construing a written agreement in defendant's favor where one paragraph stated that he would serve a "maximum of fifteen years" while another paragraph stated "fifteen to life"); Brown, 337 F.3d at 1158-62 (9th Cir.2003) (finding that the prosecutor had breached a promise, made on the record, that the defendant would "get out in half the time" if he "behave[d] [himself] at the state prison").

/////

1       Petitioner has failed to demonstrate that the denial of parole constituted a breach of the terms of his plea agreement or that he is entitled to issuance of the writ of habeas corpus. <u>Silva</u>, 279 F.3d at 835.  This claim should also be denied.

      IT IS HEREBY ORDERED that petitioner's application for a writ of habeas corpus is denied.

DATED:  September 23, 2008.

_____
UNITED STATES MAGISTRATE JUDGE

001/duva1591.157