1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9   JAMES ELMOND DUVAL,

10              Petitioner,                    No. 2:08-cv-1591 JFM

11        vs.

12   M.C. KRAMER, Warden,

13              Respondent.                    ORDER[1]

14   _____/

15              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

16   habeas corpus under 28 U.S.C. § 2254 challenging his 2007 denial of parole.  On October 15,

17   2008, petitioner filed a request for extension of time in which to file his traverse.  However, on

18   October 24, 2008, petitioner filed a document indicating that his traverse was appended to his

19   September 30, 2008 motion for reconsideration, and asked the court to consider that motion, in

20   its entirety, as the traverse.

21              Petitioner alleges that the action by the Board of Parole Hearings ("Board") and

22   the district attorney's opposition to petitioner's parole, violated the terms of his plea agreement

23   and his right to due process.  Petitioner also contends that the state courts' denials were contrary

24   to clearly established law and resulted in a denial of petitioner's due process rights.

25   _____

26        [1]  Both parties consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c).
     (Docket No. 6; Docket No. 10.)

BACKGROUND

Petitioner filed a petition for writ of habeas corpus in the Sutter County Superior Court on February 14, 2008.  (Answer, Ex. A.)  The Sutter County Superior Court summarily denied the petition on February 19, 2008.  (Answer, Ex. B.)

On March 18, 2008, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Third Appellate District.  (Answer, Ex. C.)  That petition was denied without comment on March 20, 2008.  (Answer, Ex. D.)

Petitioner filed a habeas petition in the California Supreme Court on April 22, 2008, Case No. S162862.  (Answer, Ex. E.)  The California Supreme Court denied the petition *en banc* on June 18, 2008.

The instant petition was filed on July 10, 2008.  (Docket No. 2.)  Respondent filed its answer on September 4, 2008, and petitioner filed a traverse on September 30, 2008.

On January 17, 1995, petitioner was sentenced to a total term of thirty-five years-to-life following his guilty plea to second degree murder and his admission that he used a firearm during the commission of the crime.  (Petition, Ex. B-C.)  Neither party has provided a copy of any written plea agreement or of the transcript of the guilty plea.[2]  Petitioner has provided a copy of the minute order from the October 3, 1994 pretrial conference/entry of plea.  (Petition, Ex. B.)  This minute order suggests that, in exchange for petitioner's plea, the prosecutor reduced the charge of first degree murder with premeditation and deliberation to a charge of second degree murder.  (Petition, Ex. B.)  The minute order reflects that petitioner was advised he would be

/////

/////

---

[2]  Petitioner has provided a copy of a memo from the Sutter County Superior Court stating that the court received petitioner's request for transcripts for November 7, 1994 and November 14, 1994, but "[u]nfortunately, there are no transcripts available for those dates." (Answer, Ex. D.)  Petitioner suggests that the transcripts may have been sealed.  However, the minute order containing the entry of plea reflected a hearing date of October 3, 1994.  (Petition, Ex. B.)

sentenced to 15 years to life on the second degree murder and 20
years to life in prison on the use of the firearm enhancement.

[Petitioner] will be eligible for parole and parole date would be 13-1/2 years.

[Petitioner] could be placed on parole for life.

(Id.)

At the 2007 Board hearing, the panel summarized the facts of the crime:

On January the 6th, 1993, Yuba City Police Department Detective
John Arnold was advised by Sergeant Perry of a dead body located
at 2172 Live Oak Boulevard and further advised that it appears as
though the death was a homicide.  Detective Arnold preceded to
2172 Live Oak Boulevard and upon arrival noted the crime scene
to be located at the north end of the city in a commercial area.
Actual location of the body was at 2168-1/2 Live Oak Boulevard,
which is reportedly a commercial garage being used for a janitorial
service company, which is attached to 2168 Live Oak Boulevard.
The body was located in a small, approximately nine foot by seven
foot upstairs loft that had been converted into a living quarters.
Detective Arnold contacted Officer Thornton who was the first
officer on the scene.  Officer Thornton showed Detective Arnold
the body in a white – of a white male adult who was lying on his
back on a twin size bed who was identified as Terry Dale Boyd. . .
. Detective Arnold noted what appears to be a bullet wound to
Boyd's right lower abdomen and what appeared to be severe
trauma to Boyd's head.  There were two small caliber expended
shells visible and one being on the floor in between Boyd's feet
and one on the left side of Boyd's head.  Detective Arnold also
located a small bullet wound in Boyd's left leg.  A closer
examination of the deceased Boyd revealed that blood on his face
was still oozing and rigor mortis had not yet set in to his
extremities and that he had very little lividity.  Also noted that
there was quite a bit of blood splattered to the north wall of the loft
area and into the blankets of the bed.  It was further noted that the
interior of the garage loft area showed no signs of forced entry or
any kind of struggle.  According to the reporting party, Henry
Clark, he had to use his key in order to make entry this morning
prior to finding the body.  He joined the . . . processing of the crime
scene.  Seven expended 25-caliber rounds were located throughout
the loft area.  One expended .25-caliber . . . bullet was also located
behind Boyd's head on the carpet.  On January 7th of 1993,
Detective Arnold and Officer Webster went to Ullreys . . .
Memorial Chapel in Yuba City in order to witness the autopsy of
Terry Dale Boyd.  During the course of the autopsy, it was
determined that Boyd had been shot seven times with a .25 caliber
handgun at close range and that six expended bullets were removed
from his body.  It was also determined that there were two bullet
wounds in Boyd's upper left hand chest cavity that appeared to

3

have been extremely close range if not in fact contact wounds.  The aforementioned wounds were also at such an angle that it appeared as though Boyd was bent forward after being shot first in the left leg, then the stomach, two in the chest and then three in the head and face area.

Subsequently, on November the 24th, 1993, during the course of the continued investigation in this matter, Detective Arnold received a collect telephone call from the subject who stated that he had information on Terry Boyd's homicide.  Detective Arnold asked the subject how he came about this information, to which he stated that he was there when it happened.  . . .  The subject identified himself as John Bechtel and stated that the one who shot Terry Boyd was [petitioner].  Detective Arnold reportedly knew the name Duval from the beginning of this investigation from an unknown caller that said that a guy named Lurch was responsible, . . . .  Detective Arnold conducted a check of the name Lurch and found that there were two different subjects that go by that name.  One was [petitioner].  Detective Arnold asked Bechtel some particulars about the murder, which only law enforcement and somebody who was at the crime scene would know.  These questions were what caliber weapon was used, how many times was the victim shot and where was the body when the victim was shot.  To these questions Bechtel stated that it was a .25 caliber weapon used, that Boyd was shot six or seven times in the chest and head area.  Detective Boyd asked Bechtel why he wished to give up this information, to which he stated he wanted to clear his conscious and get his life back together.  Detective Arnold made arrangements to meet with Bechtel and Bechtel reportedly asked Arnold that he'd meet with him where he was because [petitioner] was looking for him and he was afraid for his own personal safety.  Detective Arnold subsequently met with Bechtel a short time later in his motel room at which time Bechtel proceeded to give Detective Arnold information concerning the murder of Terry Dale Boyd.  Bechtel stated that he had just met [petitioner] prior to the time of the murder.  On the night in question, he wanted to get a new passenger side window for his blue Datsun.  Bechtel stated on the evening, morning [sic] hours of the murder, he Bechtel was with [petitioner] and [petitioner's] girlfriend Bobby Jeanette Trammels over at an apartment of Bobby's grandmother on a street in the north end of Yuba City.  While sitting at a table with the two of them, Bechtel stated he noticed that [petitioner] was playing with a small .25 caliber handgun.  Bechtel stated that at approximately 4:00 a.m., [petitioner] told him, that being Bechtel, that he knew where he, Bechtel, could get a new window for his vehicle.  [Petitioner] and Bechtel left . . . in Bechtel's blue Datsun and drove it to a shop located on Live Oak Boulevard in order to get . . . a new window.  Bechtel pulled up in front of the shop, remained in the car while [petitioner] went up to the door.  [Petitioner] reportedly knocked and started talking to somebody over the side of the building.  There was a small window that

possibly some other person was inside looking out.  A few minutes
later a male adult, Bechtel stated it was Boyd, came to the front
door and let Bechtel [sic] in.  [Petitioner] reportedly turned and
waved at Bechtel, who also came in.  Bechtel reportedly entered
the shop where he'd already climbed up a ladder and was in the loft
like area, [petitioner] following.  Bechtel stated that a few minutes
later [petitioner] could be heard arguing with Boyd about Boyd's
ripping him off for an eight ball of meth.  Bechtel reports hearing
Boyd say no, no and then heard pop, pop, pop.  Bechtel reported
looking up and seeing [petitioner] fumbling with a handgun, it was
jammed.  He . . . saw Boyd sort of sitting on the bed or something,
then he heard pop, pop, pop again.  At this point, Bechtel figured
out what happened and that [petitioner] . . . had shot Boyd.
Bechtel stated he fled to the door and [petitioner] right behind him
and drove [petitioner] back over to Melton Drive where his
girlfriend lives.

(Petition, Ex. A at 13-19 (from probation report).)  Petitioner declined to discuss any aspects of

the crime.  (Id. at 20.)

A representative of the Sutter County District Attorney's Office was present at the

parole hearing to oppose parole and recommended parole be denied for the next five years.

(Petition, Ex. A at 51.)  With respect to petitioner's argument that his plea agreement was he

would serve 13 - 1/2 years and have a life parole, the district attorney

referred to the comment by the appellate court concluding that the
prisoner knew exactly what the consequences of his plea were
when he entered it.  It was in the context of the withdraw (sic) plea
but it belies any agreement he thought he had a firm 13 and a half
years to serve because that was not the agreement, that was not the
consequences of the plea and the appellate decision concludes
clearly that he understood the consequences of the plea.

(Petition, Ex. A at 57-58).  Petitioner, represented by counsel, did not object to or take issue with

the Deputy District Attorney's statement.  (Id. at 58.)

The panel denied parole, finding that petitioner would pose an unreasonable risk

of danger if released:

the offense . . . was especially cruel, certainly violent and callous.
In that you shot and murdered a victim after an altercation over the
minor drug deal gone bad.  The victim was abused during the
offense, shot and then shot again.  The offense was carried out in a
manner, which demonstrates certainly an exceptional disregard for

human suffering and then human life.  The motive for the crime
was real trivial in relation to the offense in that the crime was over
a relatively small amount of money.  These conclusions are drawn
from the statement of facts [recitation of facts omitted].  The
prisoner had an escalating pattern of criminal conduct.  In this
regard he had started as a juvenile in the year 1981, where he was
arrested for petty theft and then was arrested for a . . . Penal Code
496 in 1984 in which he got a suspended prison sentence and he
was arrested for burglary in 1984, which he got three years
probation and jail time.  He was arrested in 1985 for conspiracy for
burglary in which he got one year state prison but was sentenced to
CYA.  He was arrested again in 1987 for being under the influence
of drugs and having drug paraphernalia.  He was given 90 days jail
and then in 1993 he was arrested for the instant offense.  He failed
to profit from [society's] previous attempts to correct his
criminality.  In this regard, juvenile probation, adult probation,
CYA, county jail on three different occasions and also then having
probation revoked.  He had an unstable social history.  It was not
his fault of course that he came from a divorced family.  A family
that's constantly on the move every eight to twelve months.  He
went to 11 different grade schools.  He dropped out of school
during the eighth grade, however he did pick up a GED later on.
He started drinking beer and alcohol at the age of 15.  Started using
marijuana around the age of 19.  Started also using meth about the
same period of time and started using it every day.  He then was
first arrested and convicted in 1981 and that series of arrests and
convictions continued on until the instant offense in 1993.  The
prisoner has recently started programming while incarcerated.  He
has failed at this point to develop a documented certified
marketable skill that can be put to use upon release.  He has failed
to develop or to upgrade himself educationally or vocationally
since he's been in prison.  He has only recently started to
participate in beneficial self-help programs, which he should
certainly continue.  He had eight 128 counseling chronos, the last
being in the year 2000.  He had six serious 115 disciplinary reports,
the last one being 6/11 of the year 2002 and that's for disobeying a
direct order.  Should be noted that in regard to the 115's, he's had
of the six, two were for violence and one was for the manufacture
of alcohol.  The last psychiatric report was 8/17 of 2006, J.
Steward, Doctor of Psychology.  This was an unfavorable report.
He notes the following[:]  if released to the community [petitioner]
is estimated to have a very high risk for violence, which is based
upon his criminal history, the instant offense and the two CDC
115's for violence.  In particular, it's very unlikely that one with an
antisocial personality disorder [with such propensity] and
willingness to kill somebody else to be considered suitable for
parole within society.  Even though he presents a sociable and
affable manner during the interview, this belies a cold, calculated
nature of his personality to eliminate somebody else's life without
reason or conscience.  Terry Boyd who was defenseless and
compliant, owed [petitioner] a [paltry] sum and wanted to have . . .

6

his own girlfriend murdered.  His parole plans, he does have viable
residential plans with his mother.  However, he does not have
acceptable parole plans.  He needs to have more detail in his parole
plans working possibly for his mother or family.  Either that or he
needs to have more detailed parole plans in regard to getting an
acceptable position elsewhere, such as working with . . . equipment
– probably a lathe or equipment work.  He does not have a certified
or verified marketable skill at this time.  He also needs to develop a
substance abuse relapse plan, that is a plan, which lists all the AA
and NA facilities in or around the area which [petitioner plans] . . .
to . . . parole to.  The 3042 responses, we did not receive any
letters.  However, we did . . . have a representative from the Sutter
County District Attorney's Office who spoke and was against
parole at this time and recommended a five year denial.

(Id. at 59-63.)  The panel relied on the same factors to find that it was not reasonable to expect

that parole would be granted in the following four years.  Id. at 64-66.

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

      Federal habeas corpus relief is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d).

      Under section 2254(d)(1), a state court decision is "contrary to" clearly

established United States Supreme Court precedents if it applies a rule that contradicts the

governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

(2000)).

/////

1    Under the "unreasonable application" clause of section 2254(d)(1), a federal
2  habeas court may grant the writ if the state court identifies the correct governing legal principle
3  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the
4  prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ
5  simply because that court concludes in its independent judgment that the relevant state-court
6  decision applied clearly established federal law erroneously or incorrectly. Rather, that
7  application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75
8  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal
9  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

10    The court looks to the last reasoned state court decision as the basis for the state
11  court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court fails
12  to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional
13  or federal law, the Ninth Circuit has held that this court must perform an independent review of
14  the record to ascertain whether the state court decision was objectively unreasonable. Himes v.
15  Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court
16  applied the correct law, and analyzes whether the decision of the state court was based on an
17  objectively unreasonable application of that law.

18  II.  Claims One and Two

19    Petitioner's first two claims challenge the denial of parole and the district
20  attorney's opposition to parole as a breach of petitioner's plea agreement in violation of
21  petitioner's due process rights. Because no state court rendered a reasoned opinion, this court
22  reviews the record to determine whether the state court decision was objectively unreasonable.

23    When a criminal defendant pleads guilty in exchange for certain promised actions,
24  his right to due process of law entitles him to fulfillment of those promises. Santobello v. New
25  York, 404 U.S. 257, 262 (1971). In this case, petitioner alleges that his plea of guilty to second
26  degree murder was premised upon a promise that he would parole in 13-1/2 years.

1          Petitioner has presented nothing showing that the nature of his guilty plea or that

2   any bargain leading to the plea included a promise that he would be paroled or would be paroled

3   on a date certain.  The sentencing transcript shows only that the prosecutor moved to edit the

4   charge in count one from first degree murder with premeditation and deliberation to a charge of

5   second degree murder.  (Petition, Ex. B.)  While it is true that the minute order reflects that the

6   district attorney stated petitioner would be "eligible for parole and parole date would be 13-1/2

7   years" (id.), such language does not reflect a promise that petitioner would be paroled at any time

8   short of the maximum term of life.  The prosecutor's statement gave petitioner a possibility, not a

9   guarantee, of parole.  Compare Brown v. Poole, 337 F.3d 1155, 1160 (9th Cir. 2003) (during plea

10  colloquy, prosecutor said that defendant had a right to release after serving half her term if she

11  was disciplinary-free).  Unlike Brown, the prosecutor in the instant case stated petitioner was

12  "eligible"[3] for parole.  In Brown, the prosecutor promised the defendant during the plea colloquy

13  that the defendant would "get out in half the time" if he behaved himself in prison.  Id. at 1158.

14  The minute order in the instant case does not reflect such a promise and petitioner has presented

15  no other evidence suggesting such an agreement.

16          Petitioner also argues that the district attorney's opposition to petitioner's parole

17  at the 2007 Board hearing violated petitioner's due process rights.  However, petitioner has not

18  provided any evidence that there was an agreement by the prosecution to refrain from opposing

19  parole.  The minute order does not reflect any such agreement.  (Petition, Ex. B.)  As noted

20  above, petitioner has failed to provide a transcript of the plea hearing.  Compare United States v.

21  Anderson, 970 F.2d 602, 608 (9th Cir. 1992), as amended on denial of rehearing, 990 F.2d 1163

22  (9th Cir. 1993) (factual stipulations as part of plea agreement may prevent government from

23  presenting additional facts to the parole board); see also People v. McElwee, 128 Cal.App.4th

24

25          [3]  The word "eligible" is defined as "qualified or entitled to be chosen."  The American
    Heritage® Dictionary of the English Language, Fourth Edition. Retrieved September 18, 2008,
26  from Dictionary.com website:  <http://dictionary.reference.com/browse/eligible>.

1348, 1353 (2005) (<u>Harvey</u> did not constrain prosecutor from arguing facts of the offense to the

parole board). Petitioner has failed to bear his burden of showing he is entitled to the issuance of

the writ. <u>Silva v. Woodford</u>, 279 F.3d 825, 835 (9th Cir. 2002) (petitioner's burden to show he is

in custody in violation of the constitution).

III. <u>Third Claim</u>

In his third ground for relief, petitioner contends that the state courts' decisions to

deny his petition for habeas corpus and petition for review were contrary to clearly established

law and resulted in a denial of petitioner's right to due process.

The Sutter County Superior Court utilized a checklist form of order to deny the

petition for writ of habeas corpus. The following boxes were marked:

> Undue delay. Petitioner is required to explain and justify any
> significant delay in seeking habeas corpus relief (<u>In re Clark</u>, 5 Cal.
> 4th 750, 764).
>
> Failure to raise issue on appeal. In absence of special
> circumstances constituting an excuse for failure to employ that
> remedy, a writ will not lie where the claimed errors could have
> been, but were not, raised upon a timely appeal from a judgment of
> conviction (<u>In re Walker</u>, 10 Cal.3rd 764, 773 and <u>In re Clark</u>, 5
> Cal. 4th 750, 765).
>
> Issues resolved on appeal cannot be reconsidered on habeas corpus.
> (See <u>In re Waltreus</u> (1965) 62 Cal.2d 218, 225.)

(Petition, Ex. F.) As noted above, both reviewing courts denied petitioner's applications without

comment.

In the petition presented to the Sutter County Superior Court, petitioner was also

challenging the denial of parole as a breach of his plea agreement. Because petitioner could not

have foreseen a future denial of parole, particularly at the time of his direct appeal, petitioner

could not have brought this claim at that time. While it appears the Sutter County Superior Court

may have misread the petition as a challenge to his plea agreement, his petition made clear he

was challenging the Board's denial of parole as a violation of the terms of his plea agreement.

(Answer, Ex. A, at 3.) As petitioner notes, the factual predicate of petitioner's claim did not arise

1  until March 21, 2004.  (Petition at 7.)  Inasmuch as the state court petition challenged the 2007

2  denial of parole, there was no significant delay in bringing that challenge.

3        Finally, inasmuch as the issue petitioner raised was not resolved on direct appeal,

4  the citation to In re Waltreus was incorrect as well.

5        The Sutter County Superior Court's summary disposition was incorrect,

6  constituting error under the "contrary to" prong of § 2254(d)(1).  See Frantz v. Hazey, 533 F.3d

7  724 (9th Cir. 2008)(en banc).  Because the Sutter County Superior Court's summary disposition

8  relied on inapplicable legal authorities, it appears the § 2254(d)(1) standard for the grant of

9  habeas relief is satisfied.  Frantz, 533 F.3d at 734.

10        The errors of the state courts do not, however, require that the petition be granted

11  in this court.  Confronted with an analogous situation the Frantz court concluded that "federal

12  habeas courts must review the substantive constitutionality of the state custody de novo."  Id. at

13  737.  In other words, even though § 2254(d)(1) error occurred, this court must now consider de

14  novo whether the denial of parole violated the terms of petitioner's plea agreement.

15        Plea agreements must be analyzed using ordinary rules of contract interpretation.

16  "Plea agreements are contractual in nature and are measured by contract law standards."  United

17  States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir.1993).  The terms of oral plea agreements are

18  enforceable, as are those of any other contracts, even though oral plea agreements are not

19  encouraged by reviewing courts.  See, e.g., United States v. Monreal, 301 F.3d 1127, 1133 (9th

20  Cir. 2002).

21        On this record, the denial of parole did not violate the terms of petitioner's plea

22  agreement.  The October 3, 1994 minute order does not state that petitioner pled guilty to second

23  degree murder in exchange for, inter alia, a promise that he would be paroled in thirteen and one-

24  half years.  (Petition, Ex. B.)  Rather, the minute order reflects that the prosecution agreed to

25  reduce the charge in Count I from first degree murder with premeditation and deliberation to

26  /////

11

second degree murder.  (Id.)  The district attorney advised petitioner of the following pertinent

consequences of his plea:

> [Petitioner] is ineligible for probation.
>
> The sentence pursuant to law is 15 years to life on the 2nd degree murder and 20 years to life in prison on the use of the firearm enhancement.
>
> [Petitioner] will be eligible for parole and parole date would be 13-1/2 years.
>
> [Petitioner] could be placed on parole for life.

(Petition, Ex. B.)  The minute order does not reflect a promise or guarantee that petitioner would

be paroled within thirteen and a half years; only that petitioner would be "eligible" for parole

within thirteen and a half years.  There is no promise or guarantee that the prosecution would

support petitioner's bid for parole at that time or that the prosecution would refrain from

opposing petitioner's parole at that time.  Because the language "will be eligible for parole"

precedes the language "parole date would be 13-1/2 years," parole is conditional on the Board's

finding petitioner to be suitable for parole, and the earliest date that determination could be made

would be in 13-1/2 years.  The sentence "could be placed on parole for life," bolsters the reader's

understanding that petitioner's parole status would be determined at a later time.

        Petitioner's claim that the prosecutor's statements demonstrate he was promised

release on parole in 13-1/2 years does not entitle him to habeas relief.  Petitioner has provided no

evidence to support an inference that his plea agreement carried a guarantee of release after 13-

1/2 years.  To the contrary, the record suggests petitioner received an indeterminate sentence of

35 years to life in exchange for his plea of guilty to second degree murder.  The record does not

reflect that petitioner received an affirmative, or even an ambiguous, assurance that he would be

released at a certain point in time.  See Buckley v. Terhune, 441 F.3d 688, 691-98 (9th Cir.2006)

(construing a written agreement in defendant's favor where one paragraph stated that he would

serve a "maximum of fifteen years" while another paragraph stated "fifteen to life"); Brown, 337

1  F.3d at 1158-62 (9th Cir.2003) (finding that the prosecutor had breached a promise, made on the

2  record, that the defendant would "get out in half the time" if he "behave[d] [himself] at the state

3  prison").

4         Petitioner has failed to demonstrate that the denial of parole constituted a breach

5  of the terms of his plea agreement or that he is entitled to issuance of the writ of habeas corpus.

6  Silva, 279 F.3d at 835.  This claim should also be denied.

7  IV.  Request for Evidentiary Hearing

8         In his traverse, petitioner contends an evidentiary hearing is necessary because his

9  claims cannot be resolved on the existing state court record.  (Id. at 7.)  Petitioner argues the state

10  court did not issue orders to show cause, therefore petitioner "did not have the power to

11  subpoena relevant documents."  Petitioner contends "these documents will reveal the mutual

12  intentions of the parties at the time of contracting."  (Id. at 7, citing Exs. D & H to Pet.)

13         However, a federal court does not have to hold an evidentiary hearing when the

14  record refutes petitioner's factual allegations in the federal petition.  In Schriro v. Landrigan, ___

15  U.S. ___, 127 S.Ct. 1933, 1940 (2007), the Supreme Court added another consideration in

16  granting evidentiary hearings.  The Supreme Court held that "[b]ecause the deferential standards

17  prescribed by § 2254 control whether to grant habeas relief, a federal court must take into

18  account those standards in deciding whether an evidentiary hearing is appropriate."  127 S.Ct. at

19  1940.  Thus, "[i]t follows that if the record refutes the applicant's factual allegations or otherwise

20  precludes habeas relief, a district court is not required to hold an evidentiary hearing."  Id.

21         Petitioner has not identified what particular documents he might have

22  subpoenaed, nor how they would refute the facts found in the present record.  Exhibit D to

23  plaintiff's complaint is a memo from the Sutter County Superior Court confirming no transcripts

24  were available in case #96SU606 for November 9 or 14, 1994.  Exhibit H is a copy of the

25  October 13, 1995 state Court of Appeal opinion, which addresses petitioner's efforts to withdraw

26  his plea.  These documents do not refute the record evidence.

1      The fact that there are no transcripts from November 9 or 14, 1994, does not

2  address whether a transcript might have existed for the change of plea hearing that took place on

3  October 3, 1994 (Petition, Ex. B), nor does it provide any factual basis to refute the instant

4  record.  Petitioner has not provided evidence of his diligent efforts to obtain the October 3, 1994

5  transcript from the entry of plea hearing.  Petitioner's efforts to withdraw his plea do not shed

6  any light on either the prosecution's or petitioner's intentions with regard to the plea offer or

7  bargain.  Petitioner has failed to provide any evidence that contradicts the plea agreement as set

8  forth in the October 3, 1994 minute order.

9      Under the stringent standards set forth by the Antiterrorism and Effective Death

10  Penalty Act of 1996, petitioner has failed to demonstrate he is entitled to an evidentiary hearing.

11  In light of all of the above, this court is not required to hold an evidentiary hearing; petitioner's

12  request will be denied.

13      Finally, on October 28, 2008, petitioner filed a motion to order the Sutter County

14  Superior Court to submit transcripts for court proceedings held on November 7, 1994 and

15  November 14, 1994 in case no. 96su0606.  However, as noted above, the Sutter County Superior

16  Court already informed petitioner that no transcripts exist for proceedings on those dates.  (Pet.,

17  Ex. D.)  Thus, petitioner's motion will be denied.

18      IT IS HEREBY ORDERED that:

19      1.  Petitioner's September 30, 2008 request for evidentiary hearing is denied;

20      2.  Petitioner's application for a writ of habeas corpus is denied; and

21      3.  Petitioner's October 15 and October 28, 2008 motions are denied. [19 & 21]

22  DATED:  November 6, 2008.

23

24

25  UNITED STATES MAGISTRATE JUDGE

26  001/duva1591.157

14